[Echols v. Hubbard.]

# Echols *v.* Hubbard.

*Bill in Equity for Cancellation of Deed as Cloud on Title.*

1. *Cancellation of deed as cloud on title.*—A court of equity will take jurisdiction to remove a cloud from the title to land, only when there is no remedy at law by which the superiority of apparently conflicting titles may be tried and determined; and this extends to cases (1) in which the complainant is in possession, and (2) in which, though he may be out of possession, he has only an equitable title, which is not available at law.

2. *Written agreement for division of lands among testator's heirs and devisees.*—A written agreement among the several heirs and devisees of a decedent, for the division of lands held by them as tenants in common, not containing any words of conveyance, not executed with the statutory formalities of a deed, and not confirmed by the decree of any court, is operative between the parties on the principle of estoppel, but does not convey a legal title which will support ejectment against a stranger.

3. *Secondary evidence of lost deed.*—Secondary evidence can not be received to establish the execution and contents of a deed more than forty years old, on the testimony of the surviving widow of the grantee, who was also executrix of his will, that she supposes it was destroyed, with other papers relating to the administration of the estate, by the burning during the late war of the court-house of the county in which the administration was pending; and of a son, who was also executor, that he last saw the deed in a writing-desk at the family residence in another county.

4. *Presumption as to ancient deed.*—Possession of land for forty years under claim of title being uncontroverted, the execution of a deed will be presumed, although it is not produced, nor a sufficient predicate laid for the introduction of secondary evidence; but the presumption extends only to the lands so continuously occupied, and does not extend to the location of a disputed boundary line, which determines the ownership of the strip of land in controversy.

5. *Adverse possession as conferring title.*—Continuous adverse possession for ten years, before suit brought, confers a title which will support or defeat an ejectment; and when the plaintiff shows such prior adverse possession, his title is not defeated by a subsequent interruption of his possession, or a subsequent occupancy by an adverse claimant, unless the latter has ripened into a title by continuance for ten years or more.

6. *Removing cloud, or quieting title to land.*—A court of equity will take jurisdiction to quiet the title to land, (1) when the claimant claims under written title, but one link in the chain is lost, or is wanting in definiteness and certainty, thereby requiring a resort to evidence *aliunde*; and (2) when his title is founded on adverse possession in his grantor, which can only be established by parol evidence, and he has no legal remedy because he claims under a written instrument which conveys only an equitable title.

APPEAL from the Chancery Court of Madison.
Heard before the Hon. THOMAS COBBS.

[Echols v. Hubbard.]

The bill in this case was filed on the 8th March, 1888, by Felicia C. Hubbard, an infant suing by her next friend, against Wm. H. Echols and his wife; and sought (1) to establish and quiet the complainant's title to a small strip of land, of which she claimed to be in possession; (2) to enjoin the defendants from erecting a fence, or otherwise trespassing on it; and (3) to remove a cloud on her title by an alleged misdescription of land in the deed under which the defendants claimed. The strip of land was about 110 feet north and south, and about 415 feet east and west, and adjoined on the north a lot of which complainant was in undisputed possession, and her title to which was not controverted. The land is a part of the property in Huntsville formerly known as "Pope's Hill," which once belonged to Wm. H. Pope; and each party claimed under him. The complainant's claim was, that the strip of land was part of a lot which Pope had sold and conveyed to Dr. Alfred Moore in 1839, which said Moore's executors had sold and conveyed to Reuben Chapman in 1858, and which had been allotted to her, a grand-daughter of said Chapman, under a written agreement for a partial distribution and division of his estate among his heirs at law and devisees, in December, 1884. The defendants claimed it under a deed executed in February, 1849, by L. P. Walker, as administrator of the estate of Wm. H. Pope, to Dr. C. H. Patton, who was the father of Mrs. Echols. The deed from Pope to Dr. Moore was not produced, and a material question in the case was the admissibility and sufficiency of the parol evidence to establish its loss and contents. The deed from Moore's executors to Chapman, which was dated September 11th, 1858, described the lot conveyed as " containing two acres, more or less, bounded on the north and east by the land of Dr. (C. H.) Patton, and on the south by" McClung street. The deed of L. P. Walker, as administrator of Pope, to Dr. Patton, conveyed about thirty acres of land, sub-divided into lots and parcels, which were described by boundaries, courses and distances; and, on approaching the south-east corner of the lot conveyed to Dr. Moore, described his lot as running north "seven poles," after which Dr. Patton's line ran due west, which made his deed embrace the strip of land here in controversy. The fences around the property were destroyed during the late war, and the case involved a question of disputed boundary arising partly from that fact, and partly from overlapping descriptions in the different conveyances. The defendants denied the complainant's ownership and possession of the land, and asserted title and possession in themselves; and they demurred to the bill, (1) for want of equity, and (2) because complainant had an adequate

[Echols v. Hubbard.]

remedy at law.  The chancellor overruled the demurrer, and, on final hearing on pleadings and proof, rendered a decree for the complainant.  The defendants appeal, and here assign this decree as error, with other rulings which require no notice.

D. D. SHELBY, for appellants.

HUMES, WALKER & SHEFFEY, *contra*.

McCLELLAN, J.—Jurisdiction to remove a cloud from title is exercised by courts of chancery only in default of a remedy at law by which the question of the superiority of apparently conflicting titles may be tried and set at rest.  The right to resort to equity arises only when, and for the reason that, the complainant is so situated with respect to the possession, or his rights so depend upon an equitable title, as that he can not invoke the judgment of a court of law.  If he is in possession of the land, as to which his title is under a cloud, he must resort to equity, since the only legal actions in which questions of title may be adjudicated, involve the possession, must be brought against the person in possession, and can not be brought, of course, for a possession which is already in the plaintiff.  But, if he is in fact out of possession, he may always maintain ejectment, or the kindred statutory real action; and this, wholly regardless of the circumstances of his disseizin.  And if he *may* sue at law, he *must*.

In the case at bar, the defendants were in possession of the land on the day the bill was filed.  That their possession may have been acquired by trespass, that its acquisition may have been wrongful, surreptitious or violent, is immaterial.  However acquired, and however impotent a possession so acquired would be to break the continuity of an adverse holding, the fact remains that it was held by the defendants at the time this suit was instituted, and an action of ejectment could then have been brought by the complainant; and in that action, the cloud supposed to rest on any legal title the complainant had, by reason of an apparently better title in the defendants, would have been removed by a judgment for the plaintiff.  If, therefore, complainant's right to maintain the present bill depended on the fact of possession being in her when it was filed, the theory being that defendant's alleged trespass was not sufficient to oust her, she would have no standing in court, and the bill ought to have been dismissed.— *Gould v. Steinburg*, 105 Ill. 488; *Teague v. Martin*, 87 Ala. 500.

But equity jurisdiction is invoked on the further ground, that the complainant holds under an equitable title, upon

which her rights could not be asserted and effectuated in a court of law. This, of itself, is a sufficient predicate for the interposition of the Chancery Court, irrespective of possession.—2 Encyc. Amer. & Eng. Law, 303; 3 Pom. Eq. Jur., § 1139, note 4; *Armstrong v. Connor*, 86 Ala. 350, and cases cited. We think the complainant brings herself within this exception in favor of equitable titles. The land in controversy is claimed by complainant, through the late Reuben Chapman. By his last will, all of his real and personal property was devised and bequeathed to his four living children and the complainant, who is a grand-daughter of the testator, to be divided among them share and share alike. On December 29, 1884, an agreement was entered into by the devisees for a partial division and distribution of the estate. This agreement is signed by Reuben Chapman, individually and as executor, by the surviving daughters of the testator and their husbands, and by Mrs. Humes, for and as guardian of the complainant, who was and is still an infant. It evidences that a division and allotment had been made to and among the several devisees and legatees, and that a part of the share allotted to the complainant was the lot, a part of which is in controversy, at a valuation of nine hundred dollars, it now being worth greatly more than that sum; and that all of said parties " do agree to the foregoing division and distribution of the property of said testator embraced herein, and do hereby agree that the same shall be of binding force and effect upon us, as far as the same may be made by this agreement." It was further agreed that the executor should proceed in the Chancery Court to have the agreement, and the division, distribution and allotment thereby made, confirmed in all things, and also for a final settlement of the executorship and a division and distribution of the remaining property of the estate. It does not appear that a decree confirming the allotment had been obtained, or that the estate had been finally settled at the time the present bill was filed. The agreement contains no words of conveyance, whereby the legal title of the tenants in common could pass out of them, and into the several devisees according to the allotment; nor is it executed with the formalities requisite to the transmission of such title. The effect of this instrument, therefore, was only to raise up an estoppel in favor of the complainant, against her co-tenants, as to the land in controversy, upon which she could invoke the jurisdiction of the Chancery Court to the divestiture of the title out of them, and have it conveyed into her.—*Carter v. Owens*, 41 Ala. 217. Very clearly this is nothing more than an equitable title, which she could not assert at law. Very clearly, also, a right to possession could

not, in a legal forum, be predicated on this title, which, coupled to her prior possession, would enable her to prevail in ejectment over the paper title and actual possession of the defendants.—*Standifer v. Swann*, 78 Ala. 88; *Wood v. Montevallo Coal & Transportation Co.*, 84 Ala. 560. It may be that she could have maintained an action of forcible entry and unlawful detainer; but that would be a mere circuity, at the end of which her title would be as clouded as it now is, and her right to exhibit this bill would be the same that it now is.

Nor is this conceived to be a case involving the relation of trustee and *cestui que trust*, in which it would be primarily the latter's duty to have the former sue at law, and inability to procure that to be done is required to be alleged and proved. The complainant has, we therefore conclude, no remedy at law for the adjudication of the issues presented in her bill, and, though out of possession, she is entitled to the relief prayed, if the proof supports her averments of fact. To that inquiry our further consideration will be directed.

The strip of land in dispute, as well as the larger lot of which it is a part, and the lots lying on each side and back of it, belonged in 1839 to William H. Pope. This is conceded, and both parties to this controversy now claim under him. The complainant's claim of title to the strip in question is twofold: *First*, she says that Pope conveyed a lot embracing the strip to Alfred Moore, about the year 1839; that Moore's executors conveyed the same to Chapman in 1858, and that she holds under Chapman, as we have indicated above. But, *second*, she says, if in fact there was no deed from Pope to Moore, covering the disputed strip, yet she, and those under whom she holds, have had adverse possession of the land for more than ten years, and thereby have acquired a perfect title against all the world. On the other hand, the defendants claim under a deed dated February 5, 1849, from Pope's administrator to Charles H. Patton, the ancestor of the defendant, Mrs. Echols. This conveyance is of a considerably larger tract of land, which abuts on the lot alleged to have been held by Moore, and embraces in its calls about one-half of the lot which complainant alleges had been sold by Pope in his lifetime to Moore. It is this overlapping of description in the administrator's deed to Patton, which is alleged to constitute the cloud on complainant's title; the theory being, that the description in Pope's deed to Moore is not sufficiently specific and definite to operate, of itself, an avoidance and nullification of the later deed to Patton, in respect to the conflicting boundaries.

We do not think there is any competent, direct evidence in

this record of the existence and contents of a deed from Wm. H. Pope to Alfred Moore. An effort was made to prove its loss, so as to authorize secondary evidence of its execution and contents. Two witnesses were examined for this purpose. One of them, Mrs. Moore, the widow of Alfred Moore, and executrix of his last will, does not testify either to the existence or loss of such deed. Her evidence amounts to no more than a supposition that a deed was executed, and a supposition that the supposed deed was destroyed when the court-house at Athens was burned by Federal soldiers, based on the assumption that the deed had been filed there along with papers connected with the administration of the estate. The other witness, George H. Moore, a son of Alfred Moore, and co-executor with the wife, proves the existence of the deed, but utterly fails to establish its loss. He testifies that it came to his custody as executor of his father's estate, and that he left it, or the last he knew of it was, in a certain desk, or secretary, at the family home in Huntsville. There is no evidence that any search was ever made for it, and *non constat* but that it was there at the time of the hearing in the court below, and was not lost at all. This was far from being a sufficient predicate for the introduction of secondary evidence of the execution and contents of the alleged deed.—1 Greenl. Ev. § 558; *United States v. Sutter*, 21 How. ( U. S.) 170; *Woods v. Montevallo C. & T. Co.*, 84 Ala. 560.

But we do not understand it to be controverted that Moore owned a lot fronting about two acres on McClung street at this point. The deed from Pope's administrator to Patton, under which defendants claim, itself demonstrates the fact, in a way not open to denial by them, that Moore owned a lot of that width at that place. Nor is it controverted that Moore, and his successors in right or claim, have been for more than forty years in possession of such lot. Under this state of facts, the execution of a deed by Pope to Moore, to the land as to which his possession is this uncontroverted, will, after the lapse of so long a time, be presumed. Such deed, however, could be considered as embracing only lands as to which the conditions upon which the presumption arises exists. The presumption could not be indulged with respect to the lot in suit, since the predicate for it—long continued beneficial possession—is not admitted, but on the contrary is chief among the points of contest in the case. We can not presume the existence of a deed embracing the disputed strip, and the evidence of Mrs. Moore and George H. Moore, to the effect that the deed, which is attempted to be proved by them, did embrace the strip, being, as it must be, excluded, the complainant's right to the

relief prayed must depend either upon proof of such conditions with respect to the strip, such long-continued possession of it under claim of ownership, as will raise up the presumption of a conveyance from Pope embracing it, or upon proof of such adverse possession on the part of those under whom she claims as will, of itself, vest title in her. It would seem, in this view of the law, that the doctrine by which the execution of a deed will be presumed, in the sense in which we have been considering that principle, can be of no real advantage to the complainant here, since a possession which would entitle her to the benefit of that presumption would, without its aid, more than suffice to vest legal title in those through whom she claims, under our statute of limitations. For all practical purposes, therefore, the case is narrowed down to the inquiry, whether Moore, or Chapman, or the devisees of Chapman, at any point of time, had title perfected in them, or either of them, by ten years continuous adverse possession of the strip of land in suit. We use the phrase "at any point of time" advisedly. The precise meaning we intend thereby to convey is, that the ten years relied on in any case to vest title by adverse possession, need not be the ten years next before action brought. On the contrary, we understand the law to be, that any ten years of continuous adverse possession before suit brought will vest title in the holder, as efficiently and absolutely, for all purposes, as would an absolute conveyance from the holder of the fee.—*Allen v. Mansfield,* 82 Mo. 688; *Unger v. Mooner,* 49 Amer. R. 100; *Hoffman v. White* (present term). And a title once acquired by the lapse of the statutory period of adverse holding, standing, as it does, upon the same plane as a paper title in all respects regular, will not be defeated by any after interruption of possession, or by the subsequent holding of an adverse claimant, unless such holding itself be actual, open, notorious, hostile, and of sufficient duration to bar the entry of the true owner, *i. e.,* the owner of the title perfected by the previous possession for ten years.—*Sherman v. Kane,* 86 N. Y. 57; *Spofford v. Bennett,* 55 Tex. 293; *Hoffman v. White, supra.* Moreover, it follows from, and as complementary to, the principles just stated, that a title so acquired is equally efficacious as a paper title in drawing to it the constructive possession, even against regular muniments, of the land which it covers, after the actual possession, by which it has been acquired, has ceased.

Applying these doctrines to the case in hand, the inquiry is, *first:* Was there any period of ten years adverse possession of the strip in controversy, by those under whom complainant claims, from 1839 to the institution of this suit? and if so,

[Echols v. Hubbard.]

*second:* Have the defendants, or those under whom they claim, since the lapse of such period, had adverse possession for a like time, and thereby reinvested the title in themselves? A very careful examination of the voluminous testimony in this record convinces us, that the first inquiry must be answered affirmatively, and the second in the negative. We will briefly refer to the evidence.

It is not questioned, as we have seen, that Moore bought a lot at this point on McClung street, from Pope, in 1839; nor that he took possession of it; nor that the lot fronts about two acres on that street; nor that he and his successors have ever since been in possession thereof. Neither is it denied that he went into and held posesession of that lot, under claim of right and title. The point of contest is as to the depth of that lot, and hence the area of the possession of himself and his successors back from the street. On this point Mrs. Moore testifies, that the lot, as it came to her husband from Pope, and as it was possessed and controlled by Moore, extended one acre, or about 208 feet, back from the street, and to about where the present north fence is located, thus embracing the strip in dispute; and that her husband held the lot, as thus defined, till his death in 1856. She further testifies that, after his death, his representatives, having conveyed to Chapman, put him in possession of the lot, delimited as to its north boundry by a fence about on the line of the present fence, and that the latter went into possession accordingly. It is shown that Moore's grantor, under whom also defendants claim, in the year 1843 sold the lot abutting the lot in question on the west, to A. F. Hopkins; that this lot was an acre square, and so extended back about 208 feet from McClung street; and in the deed to Hopkins described the east line of that lot as being coterminous with the west line of the Moore lot, the language of the deed being, that the Hopkins lot was bounded "on the east by a lot of Dr. Alfred Moore." Here, then, is a distinct recital and admission, by the common grantor of the parties to this cause, that the lot owned by Moore was about 208 feet in depth from the street. It was shown, also, by maps which are referred to in the deed of Pope's administrator to Patton, and otherwise, that the Moore lot was one of several of uniform depth, which were laid off by Pope in his life-time on McClung street; that the rear line of each of these lots was equidistant from the street, and that the distance between the street and the rear line of all the other lots was about 208 feet. George H. Moore testifies, that the lot contained about two acres.

Thomas W. White's testimony we regard as very important. It is full, explicit, and without material contradiction. He testified

Vol. xc.

tifies that, in 1845,–6 or–7—certainly some time before Pope's death, which must have occurred prior to December, 1848—he rented the lot from Moore, agreeing to pay the taxes on it for the use of it. He did pay the taxes on it, down to and including the year 1855, as is shown by receipts for most of the years, attached to his deposition. He says that the north fence of the lot was erected by Pope himself, and was then about where the present fence is; that the lot was also fenced on the east and west sides, and that he, witness, in 1846 or '7, built a fence on the south side, along McClung street. As thus inclosed, the lot extended back of McClung street to the depth of about one acre, and included the strip in dispute. He used and cultivated this lot from 1846 or '7, to about 1856, as Moore's tenant. Pope set up no claim to any part of it during his life-time. The sale by Pope's administrator to Patton was made while witness was in possession, and Patton went into possession up to the north fence as then and now located, and never during witness' holding, or afterwards that he knows of, claimed any land south of that fence. About 1856 witness delivered possession of the lot to Moore. The fence was then intact all around it, and witness thinks they so remained for some time afterwards. There is no evidence that any of the fences were removed before 1858 or 1859, when Mr. Ward testifies that he does not remember there was any fence along the street, but that the other sides were still fenced; and the fence on the north line was about where it is at present.

Here, then, we have the *status* of this property as to the possession definitely fixed from 1846, or 1847, to 1856. There is nothing to show that that *status* was changed, even to the extent of breaking the inclosure, prior to 1858, or 1859. White, having the actual possession, defined by complete inclosure, re-delivered that actual possession to Moore. The presumption of law is, that the actual possession thus defined continued until it is shown to have been changed in some way; and as no change is shown, certainly prior to 1858, we must conclude that Moore, in any view of the case, and upon the strictest definitions of actual possession, had the actual possession from 1847 to 1858, a period of more than ten years. *Clements v. Lumpkins*, 34 Ark. 598; *Marston v. Rowe*, 43 Ala. 271; *Clements v. Hayes*, 76 Ala. 280.

The case for complainant might be rested here, but it need not be. We do not conceive that the mere fact, that the inclosure was broken, and removed from one side of the lot, changes the character of the possession. Certainly it does not, when reference is had to the evidence of several witnesses,

who are not contradicted at all, that after his purchase in September, 1858, Chapman was in actual possession of the entire lot, and erected buildings thereon, one of which was on that part of it not now in dispute, and the other on the strip in question. And while the latter may not have been of a permanent nature, it remained there for some time, was intended as an auxiliary to the building of a large house on the lot, and its erection and continuance without objection from any source, so far as the record discloses, not only shows actual possession in Chapman, but is wholly at war with the claim now advanced by defendants. This use and possession of the lot by Chapman continued down to the war, when all the buildings then on the lot, and the fences around it, were destroyed or removed by Federal troops. Taking this evidence in connection with the well established actual possession of Moore, and in connection with the presumption of law as to the continuance thereof, we are satisfied that the actual adverse possession of complainant's predecessors in right continued from 1846, or 1847, down to 1861 or 1862, and that thereby, whether originally there was a deed from Pope to Moore covering the strip or not, a perfect legal title, with all the attributes and incidents of such title evidenced by formal writings, vested in Chapman, drawing after it the constructive possession of the land when the actual possession ceased, if indeed it did cease.

To defeat the claim now propounded by the complainant, it is upon the defendants to show that they have, since 1861 or '2, had actual adverse possession of the strip in suit, for ten years continuously. Without discussing the evidence on this point, it will suffice to say that it falls far short of proving adverse possession at any time, or for any length of time (except from the day on which the bill was filed), in the defendants. *Wheeler v. Spinola*, 54 N, Y. 377; *Miller v. Downing*, *I b.* 631; *Pike v. Robertson*, 79 Mo. 615; *Rivers v. Thompson*, 46 Ala. 335; *Childress v. Calloway*, 77 Ala. 28.

This conclusion supports the chancellor's decree on the facts. In reaching it, we have considered only competent evidence. If, therefore, any illegal evidence was admitted on the hearing below, against the objection of the defendants, the error was without injury to them. And so with respect to the taking of testimony before the cause was technically at issue. The examination of witnesses covered every point in the case at the hearing; and if it be granted that, in strictness, witnesses should not have been called after demurrer sustained to certain features of the bill, and before amendment, the demurrers being partial in their nature, and leaving a cause of action before the court, there yet was no reversible error in overruling defendant's motion to quash the depositions.

[Snodgrass v. Caldwell.]

We do not doubt that this is a proper case for the relief sought by the bill, whether complainant's title is rested on paper muniments running back to Pope, or upon the adverse possession of her predecessors in right. In the former aspect, if a link in the chain of title is lost, or the description in any link of that chain is so indefinite and indeterminate as to require a resort to evidence *aliunde* to identify the land really conveyed, the deed from Pope's administrator to Patton is a cloud on her title, "which would embarrass alienation, is calculated to engender a sense of insecurity, and may be the source of unfounded and vexatious litigation," and which a court of equity will remove while the evidence necessary to establish the real boundaries is yet at hand. In the latter aspect, where adverse possession is relied on by the complainant, which is the case we find in this record, the right, of necessity, must be effectuated by extraneous evidence, and equity may always be invoked, in the absence of a legal remedy, to quiet a title thus resting in parol.—*Marston v. Rowe*, 39 Ala. 722; *Arrington v. Lipscomb*, 34 Cal. 365; *Moody v. Holcomb*, 26 Tex. 714.

It is equally clear, we think, that complainant's claim to the relief she now seeks is not, under the facts presented, a stale demand.—*Harold v. Weaver*, 72 Ala. 373.

We find no error in the record, and the decree of the chancellor is affirmed.